IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

2:25-cv-12580-BHH-MGB

KEVIN JOHNSON, Plaintiff,

v.

CHADWICK DOTSON, Director, Virginia Department of Corrections (VDOC),
ARNOLD DAVID ROBINSON, OPERATIONS Chief, VDOC,
Serve at: VDOC
6900 Atmore Drive
Richmond, Va. 23225

SOUTH CAROLINA DEPARTMENT OF CORRECTIONS (SCDC),
JOEL ANDERSON, Director, SCDC,
WILLIE DAVIS, REGIONAL Director, SCDC,
JAMIE FERGELI, Special Agent, Office of the Inspector General, SCDC,
Serve at: SCDC
4444 Broad River Road
Columbia, SC 29221

MS. HOLLIS, Associate Warden, Kirkland Correctional Institution, SCDC,
MR. GREGGS, Associate Warden, KCI, SCDC,
MR. OCEAN, Major, KCI, SCDC,
JOHN DOE, # 1, Major, SCDC,
JOHN DOE, # 2, Major, SCDC,
JOHN DOE, # 3, Guard, SCDC,
Serve at: Kirkland Correctional Institution
4542 Broad River Road
Columbia, SC 29221

CURTIS EARLEY, Warden, Perry Correctional Institution (PCI), SCDC,
D. HAROUFF, Associate Warden, PCI,
BRENT BLAKELEY, Prison Guard Captain, PCI,
JOSEPH PERKS, Prison Guard Lieutenant, PCI,
ESSENCE BYRD, Prison Guard Sergeant, PCI,
ANDREA FOSTER, Disciplinary Hearings Officer, PCI,
A. WILLIAMS, Prison Guard, PCI,
MR. HAWKINS, Prison Guard, PCI,
DR. BALDWIN, Dentist, PCI,
NICOLE LAWSON, Dental Assistant, PCI,
A. ENLOE, Nurse Practitioner, PCI,
MS. RODRIGUEZ, Nurse, PCI,
MR. SANDERS, Nurse, PCI,
TAMARA CONWELL, Mailroom Supervisor, PCI,

KIMBERLY MCKNIGHT, Grievance Coordinator, PCI,
TAMMIE RUCKER, Mental Health Clinician, PCI, Defendants.

Serve at: PCI
430 Oaklawn Road
Pelzer, SC 29669

## COMPLAINT

1. Comes Now your plaintiff who is presently imprisoned as follows:

Kevin Johnson, No. 397279
Perry Correctional Institution
430 Oaklawn Road
Pelzer, SC 29669

2. Plaintiff is an incarcerated activist who believes in speaking out against injustices. He is acclaimed for his journalism, having published pieces with The Guardian, PBS, and other global publications, as well as publishing several books.[1] He has taken on the important role of publicizing inhumane conditions and brutal conduct of guards and certain prison and jail officials including in the Virginia Department of Corrections (VDOC) where, during latter 2024, he brought broad publicity to abusive and racist conditions in VDOC prisons, conditions so horrendous that numerous VDOC prisoners set themselves on fire in desperate efforts to be removed from those institutions.

3. Unfortunately, this critical First Amendment service has landed a target on plaintiff's back, and he is and often has been the subject of unconstitutional retaliation by guards and officials, including the transfer of plaintiff from the VDOC to the South Carolina Department of Corrections (SCDC) under color of Interstate Corrections Compact (viz, SC Code § 24-11-10 and Va. Code § 53.1-216), where he has suffered a continual series of ongoing retributions and abuses.

4. Plaintiff's transfer to SCDC came in the midst of a media storm and mounting public protests stemming from his reports on the VDOC prisoner self-immolations, which reports were responded to and denied by the VDOC and defendants Dotson and Robinson in the media, which denials were refuted by Virginia legislators and exposed by plaintiff and several media outlets to be lies, which prompted public rallies and calls for defendants Dotson's and Robinson's resignation from public office.

1. He also has his own website.

5. Plaintiff's transfer to SCDC from VDOC custody and his treatments in SCDC custody has been retaliation and abuses in response to his First Amendment activities in Virginia and then in South Carolina, and calculated by defendants to deter and prevent his continuing to engage in such activities in SCDC custody.

6. Plaintiff was subjected to a brutal and physically abusive transportation upon his arrival in SC, he was denied medical treatment and testing admitted to be needed by defendants for consequent serious injury to his leg, he was and is stripped of his Rastafarian religious practice, he has been thrown several times into and is threatened with facially abusive and illegal solitary confinement, had slanderous disciplinary reports written against him to speciously justify such solitary confinement, he was denied basic procedural protections so to ensure guilty findings on those fabricated reports, he has been stripped of the ability to communicate and correspond with outside people and the media, he has had publishing projects blocked, he has been denied dental treatment and delayed treatment unjustifiably for painful and even life-threatening dental conditions including cavities and broken teeth and an abscessed tooth, he has been refused reasonable accomodations for a hand injury that impairs his major life's activities such as performing manual tasks and communicating, he has had his attorney-client communications obstructed and confidential electronic attorney-client communications intercepted and monitored without plaintiff's or the attorney's consent or a warrant, all by defendants acting jointly and severally to violate his constitutional and statutory rights, in response to and to curtail his exercise of his First Amendment publishing and litigation activities, and in violation of his rights.

7. Plaintiff's fact pattern is extreme, but his retaliatory transfer to and abuses he's suffered in the SCDC are not unique. Instead, it is a well-worn retributive technique that VDOC and SCDC officials use to hide the truth of their unconstitutional and harmful behavior towards the individuals entrusted to their care. Plaintiff is experiencing brutal and unlawful conditions not in spite of his talents as a journalist and his bravery as an activist, but specifically because of this. This court should intervene and conclude that the measures to which plaintiff has been subject are not constitutional, legal, or humane.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over plaintiff's claims under 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act 42 U.S.C. § 2000cc-1, the Americans with Disabilities Act 28 U.S.C. §§ 12101 et seq and the Federal Wiretap Act 28 U.S.C. §§ 2510 et seq, all under 28 U.S.C. §§ 1331 and 1343.

9. Venue lies in the District of South Carolina because a substantial part of the events giving rise to the claims in this action took place in this district, plaintiff is currently being detained in this district, and many of the defendants reside in this district.

## PARTIES

10. Plaintiff is a 53-year old Black man currently imprisoned in PCI, where he has been confined since May 2, 2025. He was transferred to SCDC from the VDOC on May 1, 2025 under color of Interstate Corrections Compact (ICC).

11. The defendants are the SCDC and others employed by the VDOC or SCDC. By confining plaintiff under the ICC, the SCDC defendants are the legal agents of the VDOC.

12. The defendants were at all relevant times acting under color of state law and each are sued in their official capacities for injunctive and declaratory relief and in their personal capacities for damages. Their official functions are characterized by their official titles set out in the caption. [2]

## ADMINISTRATIVE EXHAUSTION

13. Plaintiff has exhausted all administrative remedies to the extent made available to him by defendants and all appropriate custodial officials.

14. In deliberate efforts to condone and continue the abuses that plaintiff suffered at the defendants' hands as described in this complaint, defendant McKnight systematically obstructed each of plaintiff's numerous and repeatedly attempts to seek redress of the claims raised in this action via the SCDC inmate grievance procedure.

---

2. For each defendant's official duties and responsibilities see their official titles set out in the caption of this Complaint following their names.

## STATEMENT OF FACTS

15. Plaintiff has been detained in VDOC since 1991, and is well known as an outspoken journalist and advocate who shines light on VDOC and other prison and jail systems' failures to meet constitutional standards in their detention practices. His written works have appeared in The Guardian, PBS, W Magazine, the San Francisco Bay View, and many other publications, as well as on his own website. He also has published two books of his work and numerous other books that he co-authored with other writers.

16. Plaintiff has pursued numerous lawsuits against VDOC and its agents, starting within a couple of years of his 1991 incarceration. Most of those cases challenged his conditions of confinement, as well as the facts of his confinement. He currently maintains numerous cases in Virginia state courts and federal courts.

17. In 2009 he was improperly labeled a domestic terrorist by VDOC officials at the prompting of an STG investigation team at VDOC's Red Onion State Prison (ROSP). The reason provided is that he was a chronic propagandist whose written work - about the conditions and abuses in VDOC facilities - turned the public against law enforcement and prison officials. Officials blocked his access to telephones and stopped his mail as a result.

18. Because of his attempts to speak out against VDOC and to bring together various groups of prisoners to raise awareness about unconstitutional conditions in the VDOC, VDOC officials transferred plaintiff out of state in early 2012. He was moved around from Oregon to Texas to Florida to Virginia to Indiana to Ohio and finally back to Virginia, where he is from, over a period of nine years. These moves were in efforts to stop plaintiff's First Amendment activities.

19. During September 2024 plaintiff was transferred to ROSP, one of Virginia's most notoriously abusive prisons. During October and November 2024 he publicized through audio and written articles published on various media platforms, that numerous inmates at ROSP had recently set themselves on fire, many suffering third degree burns, in desperate efforts to get transferred away from the abusive and racist conditions and treatments at ROSP.

20. Based on plaintiff's reports, over twenty media outlets and journalists picked up the story, including The Guardian, New York Times, NBC, CBS, the Richmond Times Dispatch, Virginia Defender, Radio-IQ, and others. The exposure

generated several public rallies in Virginia's capitol city, Richmond, protesting conditions at ROSP and within the VDOC, and calling for the firing of VDOC director, defendant Chadwick Dotson and operations chief defendant David Robinson, and to shut ROSP and its sister supermaximum security prison, Wallens Ridge State Prison, down.

21. In turn Dotson went in the media, the Richmond Times Dispatch, claiming that plaintiff's reports about inmates setting themselves on fire at ROSP were false and "ludicrous," and attempts by Abolitionists to take pot shots at the VDOC's image. Several media outlets went on to expose Dotson's denials to be false through internal email exchanges between ROSP's major, investigator and assistant warden obtained through Freedom of Information Act requests, where these officials were discussing multiple incidents of ROSP prisoners setting fire to themselves, and exploring options on how to deter these actions including possibly criminally prosecuting them for setting fires inside their cells and compelling them to pay the costs of their outside hospital treatment.

22. Plaintiff continued through published reports and media interviews to expose Dotson's and his staff's public deceptions about conditions in ROSP and other VDOC facilities, which continued to generate public and even state legislative opposition to conditions in ROSP and the VDOC.

23. Subsequently, in the midst of these exposures, protests and media attention, on May 1, 2024 defendants VDOC, Dotson, and Robinson had plaintiff transferred to the South Carolina Department of Corrections (SCDC) under color of the Virginia and South Carolina Interstate Corrections Compact laws, viz Va. Code § 53.1-216 and SC Code § 24-11-10. In SCDC custody plaintiff immediately faced retaliations for and treatments calculated to stop and deter his critical journalism.

24. Plaintiff was flown by VDOC plane to an airfield in Columbia, SC where he and VDOC guards were met by SCDC transport officials. The SC transportation was arranged by defendants [redacted] Anderson, and SCDC.

25. On the SC airfield, defendants John Does #s 1 through 3 put plaintiff in multiple sets of handcuffs, a chain, a "black box" device, and leg shackles. The handcuffs were secured to the leg shackles by a chain so that plaintiff was left squatting - unable to stand erect - like a primate. These defendants then lifted him into the rear carriage of a hollowed-out steel-lined transport van where

he sat on a steel bench with his feet unable to touch the vehicle's floor due to the crouching position that he was restrained in. The factory-installed seat belts had been removed from the van's transport area, the inside of which was like sitting inside a steel cargo shipping container with no padding.

26. The transport vehicle was driven by John Doe # 3 with John Doe # 1 in the passenger seat. Plaintiff was driven by them to Kirkland Correctional Institution (KCI), which is the SCDC's reception and orientation institution. The drive to Kirkland was perilous.

27. In deliberate indifference to plaintiff's safety and with knowing intent to inflict serious injury or death on him, these defendants drove in a convoy of numerous vehicles at high speeds - far in excess of speed limits - as though they were in a high speed automobile chase, with lights flashing and sirens blaring to have other vehicles move off the roads. As a result, plaintiff was violently thrown around the vehicle and bounced off its steel walls for the entire ride. Because he was manacled in an almost fetal position, plaintiff had no way of bracing or protecting himself from the impacts and being violently thrown around as the driver repeatedly accelerated ~~quickly~~ quickly, braked hard, and took turns and curves at high speeds. The experience felt like plaintiff was being beaten all over with 2"x4"s by a group of body builders. The danger to plaintiff was obvious and deliberate with him restrained as he was in a steel-lined vehicle with no seat belts applied. As a result of this experience plaintiff suffered severe pain, bruising and swelling across his body and a torn left rotator cuff.

28. In one instance, as the driver braked hard, plaintiff was thrown forcefully into the front steel wall of the van where his left foot and lower leg took the force of the impact and his body weight (then 257 lbs). Upon the impact, something along plaintiff's lower left leg popped loudly - it sounded and felt as if the bone snapped. The pain was excruciating.

29. Upon arrival at KCI, plaintiff was taken out of the transport vehicle and KCI guards readjusted his restraints so he could stand and walk upright. But he could only limp and hobble painfully on one leg due to the injury from the transport ride.

30. He was then taken through a brief intake process where the restraints were removed, he was fingerprinted, logged into the SCDC system, and shown a video. The entire

process was supervised by defendants Hollis, Greggs and Ocean. During this process these defendants had plaintiffs' facial hair shaved bald by an inmate barber above plaintiff's objections that this violated his Rastafarian religion. He was told by them that he would either submit to the forced shave or receive a disciplinary infraction and have a group of guards shave him by force.

31. Plaintiff is a Rastafarian which is recognized by both VDOC and SCDC as a bonafide religion. In observation of his duties to Creator God (Jah), as a Rastafarian plaintiff cannot shave his hair bald and grows his facial hair out, which is not permitted in SCDC. He also must observe an Ital diet which is not available in SCDC nor is there any SCDC diet equivalent to an Ital Rastafarian diet. He also smokes tobacco as part of his ritual prayers and meditations to Jah, which SCDC does not allow Rastafarians to do, however Native American inmates are allowed to smoke tobacco in SCDC in performing their spiritual practices. It is well known that Rastafarians smoke "ganga" (marijuana and/or tobacco) as part of their spiritual practice and worship of Jah. SCDC specifically forbids them from smoking or use of marijuana, which plaintiff does not smoke. Rastafarians individually choose between smoking marijuana and/or tobacco. Plaintiff chooses to smoke tobacco.

32. In SCDC plaintiff cannot grow his facial hair out as his religion requires, lest he incur disciplinary infractions and forced cuts by teams of guards.

33. After the intake process was completed, plaintiff's left leg and ankle were x-rayed at KCI but he was told he'd have to wait days for the results.

34. Following the x-rays, defendant Hollis had plaintiff put naked in a cold empty solitary confinement cell, with only a nylon smock and a filthy mattress that smelled like feces.

35. Under SCDC procedures, new SCDC intakes remain at KCI for several weeks to be orientated into the SCDC, and receive medical, dental and mental health screenings and examinations, testing and other procedures to inform the new intake of the rules, procedures, policies and operations of the SCDC, including the inmate grievance and disciplinary policies, rules and procedures. Plaintiff received none of these orientation and notification processes, because he only remained at KCI overnight. On the morning of May 2,

2025 he was transferred to PCI by directions of defendants Anderson and Davis. Plaintiff was never treated in accordance with SCDC rules or policies nor his basic legal rights. His treatment in SCDC has been that of targeted and conspiratorial abuse in retaliation for his critical journalism and to stop and deter any such actions and writings by him in SCDC custody.

**36** At PCI plaintiff was thrown by defendants Anderson, Davis, Earley and Harouff into solitary confinement (euphemistically called Restrictive Housing Unit [RHU]) for no valid reason. In fact, plaintiff was housed in general population (GP) in the VDOC at the time he was transferred to SCDC. The conditions in PCI's RHU and SCDC's RHUs, are overtly inhumane and torturous. Plaintiff will describe those conditions in ¶¶ 37 - 53 below.

**37.** Across the SCDC, the SCDC, Anderson and Davis operate RHUs. Inmates assigned to RHU are typically placed on one of two statuses, administrative detention and disciplinary detention. Disciplinary detention is based upon sentences not to exceed sixty (60) days, in each case for conviction of a disciplinary infraction. Administrative detentions are typically imposed for months to years with perfunctory ninety (90) day reviews.

**38.** PCI operates an RHU that is central to the SCDC and houses many SCDC RHU inmates who are moved to PCI from all over the SCDC to be held in RHU at PCI. Almost half of PCI's housing units are used for RHU. PCI's RHU is directly operated and supervised by defendants Earley, Harouff, Blakeley and Perks. Defendant Rucker is responsible for providing mental health care and intervention to RHU inmates at PCI.

**39.** The conditions in PCI's RHU are the same which makes administrative detention no different from punitive detention, and thus administrative detention operates as de facto punishment.

**40.** In PCI's RHU inmates are confined inside cells that are about half the size of a parking space. They remain in these single-occupancy cells for 24 hours per day. They generally receive no out of cell exercise. When outside exercise is given - generally no more frequently than once per month if that - the inmate is placed in a caged-in pen no larger than the RHU cells with nothing inside it, no exercise equipment, etc.

**41.** In RHU [redacted] inmates may have no personal property, no canteen purchases are allowed, not even for personal hygiene items. The only hygiene items allowed are state-issued soap,

toothpaste and toothbrush, and a generic deodorant that provides no protection. Hair grease, combs, brushes, conditioner, shampoo, etc. are not allowed.

42. In RHU there are no educational or vocational programs, nor jobs. There is no access to congregate religious or social programming. No personal books are allowed except one religious text. No periodicals nor materials or information printed off the internet. If any books or periodicals are received by mail, even if part of a subscription or otherwise ordered before RHU placement, the materials are confiscated and disposed of or returned to sender at the inmate's expense with no refund. The same is done with incoming personal mail containing internet materials or prints of articles. Only two one ounce personal letters may be sent out per month.

43. In some cases RHU inmates are permitted ~~a~~ a tablet on which they may place telephone calls no more than once per month. However, phone and tablet access are routinely taken for any and no reasons, as was done to plaintiff, which is detailed below.

44. Essentially, RHU inmates sit idle in the cells with nothing to do and no fresh air. The cells have no view to the outside and admits no natural light. Inmates must undergo strip and visual body cavity searches any time they leave the cells and are placed in multiple sets of handcuffs (3 pair) that typically cut into the wrists causing swelling and lacerations.

45. To receive meals, prescribed medications and showers in RHU, inmates must stand fully dressed at the back of the cell when guards arrive at their doors. If they are not so positioned, the meals, medications and/or showers are denied. This is done only at meal, medication and shower times, and as a measure of using withholding essential needs to compel submission and arbitrary control – this measure has no valid penological objective.

46. In PCI's RHU inmates are almost never provided supplies with which to clean their cells.

47. During the night the cells are left completely dark, making reading impossible inside the cell.

48. In one RHU building, where plaintiff was confined, viz PCI's D-building, the cells have no bunks. Inmates basically sleep on the floor on a concrete platform that sits about 6 inches above floor level. When it rains, water leaks onto the concrete platform through cracks in the cell's rear windows and collects in puddles on the concrete platform.

even flooding some cells - causing one's bedding to become water-saturated.

49. In the completely dark cells at night, vermin, including stinging ants, spiders, huge cockroaches from the drains and showers, and mice crawl on and around the inmates, stinging and biting them. Plaintiff was stung and bitten numerous times in this manner in RHU.

50. The RHU cells have no desks nor writing surfaces inside them. These cells contain only a metal combination toilet/sink unit. Many of these cells have no mirror. Plaintiff's cells in RHU have been without mirrors.

51. The RHU cells have two doors, one sitting behind the other. Namely an inner barred door, and an outside solid steel door with a glassed-in window that is covered with a heavy gauge steel mesh. There is also a slot on the solid outside door that remains bolted shut with a padlock on it, through which meals are passed and handcuffs are applied and removed.

52. The use of RHU is completely arbitrary. Inmates are set up and confined in RHU upon fabricated disciplinary reports as was done to plaintiff, where they often remain for months to years. And while in RHU they often receive further reports as a result of responding to the mental torture that is known to be inflicted in RHU or upon further fabricated reports.

53. The enforced idleness, isolation and sensory deprivation in RHU is known to be torture and to cause and create an extreme danger of mental suffering and injury, yet defendants impose these conditions nonetheless even on inmates with existing serious mental illnesses even in violation of the Settlement Agreement entered in the class action lawsuit <u>T.R. et al. v SCDC, et al.</u>, Case No. 2005-CP-40-2925, (S.C. Fifth Jud. Cir., effective May 31, 2016), which specifically was/is addressed to conditions in PCI's RHU and other SCDC RHUs. A case in which the court found after hearing evidence, that in "over 20,000 cases of every imaginable sort [that] have come to this Court over the years[,t]his case, far above all others, is the most troubling." See, <u>"Order Granting Judgment in Favor of Plaintiffs"</u> entered January 8, 2014.

54. At PCI plaintiff signed up for and was seen on sick call on May 8, 2025 by defendant Rodrigues, about his left leg and ankle that were injured during his

May 1, 2025 transportation ride to KCI from the airport in Columbia, SC. Plaintiff continues to believe he suffered ligament and/or tendon damage, tear or sprain, where he suffered extreme pain and disability in walking and putting weight on his left leg for weeks thereafter. He still suffers pain if he tries to run, jump or exercise on his leg.

55. He explained his injury to Rodrigues and how it occurred. In response Rodrigues became belligerent and sarcastic, telling plaintiff that the SCDC officials drove him to KCI at high speeds and driving recklessly because they were, "delivering precious cargo" and a "valuable package." She then stated, "I think you're just trying to file a lawsuit so I dont see anything wrong. That's what I'm going to report to my supervisor."

56. Rodrigues did admit that plaintiff could have a torn, sprained or otherwise seriously damaged ligament and/or tendon in his leg and foot, and that the only way of determining this was with an MRI or CAT scan, but she was not recommending these tests because she wasn't helping plaintiff sue anyone. She said that since the x-rays from KCI showed no broken bones she would do nothing further.

57. While confined in the VDOC plaintiff endured 18 years of uninterrupted confinement in solitary under conditions far worse and more isolated than conditions that the Fourth Circuit Court of Appeals found in violation of the Eighth Amendment in Porter v. Clarke, 923 F.3d 348 (4th Cir. 2019). As a result of that lengthy solitary confinement, plaintiff developed chronic depression, post traumatic stress disorder, chronic insomnia, irritability and other conditions. His conditions make him distrustful of custodial officials and their mental health staff who left him suffering all those years under such torture and illegal conditions, on top of the continued illegal abuses he'd witnessed, experienced and reported over the years. Plaintiff's reaction to placement in solitary confinement is almost instinctively to stop eating, which is what occurred upon his confinement to solitary in RHU at KCI and PCI.

58. Defendants Dotson, Robinson and VDOC know this about plaintiff because he's gone on hunger strikes numerous times upon placement in solitary in VDOC, including a 2 1/2 month long period he went without eating in early 2024 when he was put in solitary in ROSP, prompting VDOC to enter a contract with plaintiff to be transferred

to a medium security VDOC facility in exchange for him coming off the strike after he'd been treated some eleven times in hospital ERs and admitted several times to the hospital for treatment in response to the health affects of his prolonged period without food. These defendants have also conceded on court record that due to plaintiff's long period in solitary and its effects on him, he is "not amenable" to being housed in GP with other inmates and should be celled alone.

59. While in RHU at PCI plaintiff refused to eat. He was met with on May 5, 2025 and May 7, 2025 by defendants Earley and Davis in response to his not eating. Neither could give any valid reason for his confinement in RHU nor its conditions. Both agreed to eventually place him in GP and to house him in a single cell at that time. Plaintiff continued not to eat. At the May 5, 2025 meeting, Earley admitted plaintiff's RHU confinement and treatment was a forewarning what plaintiff would suffer if he engaged in his historical behaviors and activities in SCDC that he had while in VDOC custody, i.e. media exposure, critical journalism, litigation and drawing public attention to SCDC. Earley told plaintiff he wanted to see how plaintiff acted in this regard before he released him to GP.

60. When plaintiff went a couple of weeks without writing anything about SCDC, Earley sent defendant Blakeley to his RHU cell on May 12, 2025 and told plaintiff if he ate two meals, he'd be released the next day to GP. Plaintiff ate dinner that night and breakfast the next morning and was released to GP that same morning at PCI.

61. In GP plaintiff had full access to make telephone calls - one call per day - and to a tablet. The tablets are structured with 3 levels of access, depending on an inmate's status, which allow different levels of viewing options. The three levels are 1. Basic Access, 2. Basic Plus Access, and 3. Premium Access - with the first being the most limited and the third the most privileged. The three levels contain the following:

* Basic Access: BibleGateway, Calculator, Career one stop, Facility Messages, Health Notices, Khan Academy, Law Library (Westlaw), GTL Genesis (secure messages, requests to staff, document drop), Merriam-Webster dictionary, Notices, PREA video, Quran, Religious library, Sundar Gutka, Phone Dialer, GTL Education (LMS including GED prep and Life Skills), and APEX education.

* Basic Plus Access: Everything available with "Basic Access" plus eBooks, FM Radio, and Free Games (chess, hearts, solitaire, sudoku, word search).
* Premium Access: Everything available with "Basic ~~Access~~ Plus Access" plus optional paid subscription options for movies/TV, music and games.

**62.** In GP plaintiff had access to Premium Access on the tablet. Basic Access and Basic Plus Access are the options available to some RHU ~~[illegible]~~ inmates, except the "secure messages" option has been removed from RHU. "Secure messages" allows inmates to send and receive email messages to outside correspondents who are registered and approved to correspond with them.

**63.** Upon his move to GP, plaintiff sent out an article on May 14, 2025 about his transfer to SCDC, his transportation injuries, and treatment in SCDC, titled "Virginia Breaks a Leg to Transfer me to South Carolina." The article was critical of VDOC and especially SCDC, and Davis and Earley. It was widely circulated, and generated public complaints to VDOC and SCDC headquarters officials. Plaintiff was met with immediate retaliation for the article and public response.

**64.** On May 20, 2025 plaintiff was thrown back in RHU, and only minutes later confronted at his RHU cell door by defendant Fergeli who rushed up to the cell in an irate rage threatening and cursing plaintiff. Fergeli's display occurred on surveillance camera and plaintiff made repeated requests to Earley and others to preserve the footage for anticipated litigation.

**65.** Fergeli's remarks to plaintiff consisted of him telling plaintiff that he'd driven an hour from SCDC headquarters to give plaintiff a message. The message was in part, "You'd better tell your motherfucking people and the media to stop calling and emailing headquarters about you and what's going on in the SCDC." Also that plaintiff had better stop writing articles about SCDC. He threatened that if plaintiff didn't heed these warnings, he'd stay in RHU, "get hurt," face criminal prosecutions and finally that he'd have all his lines of communication ~~to~~ with the outside cut off. In response plaintiff asked Fergeli who he was, and told him he wouldn't tell anyone anything except to continue what they were doing and he told Fergeli to give his threatening message to the media himself. After cursing plaintiff for a few minutes more, Fergeli stormed off promising to cut off plaintiff's lines of communication.

66. A few minutes after Fergeli left plaintiff's RHU cell-front, defendant Blakeley came through the cellblock. Plaintiff stopped Blakeley and asked why he was put back in RHU. Blakeley told plaintiff loudly in hearing of all inmates in the cellblock that plaintiff had exposed his genitals to defendant Byrd in a lewd and obscene manner the night before, which was a false and slanderous claim. Plaintiff recognized this claim had been fabricated as a specious pretext for putting him back in RHU and using a claim that defendants expected he would be reluctant to publicize because of embarrassment.

67. Defendants Earley, Fergeli, Davis and others conspired with defendant Byrd to have her fabricate a report that plaintiff didn't receive until June 4, 2025 claiming falsely that around 9pm on May 19, 2025 plaintiff had stood naked in his lighted cell in GP as she stood at his cell door. Byrd would later claim falsely that she'd stood at his cell for two minutes while he stood with his cell light on just looking at him in this state.

68. Plaintiff requested repeatedly of various SCDC officials to review the surveillance camera footage showing his GP cell on May 19, 2025 around 9pm and that the footage be preserved for litigation, contending that the footage would show Byrd's claims to be outright fabricated. Earley was among those who refused plaintiff's requests to review the footage.

69. Two days after plaintiff was thrown in solitary and Fergeli threatened him, defendants Earley, Ferseli, Anderson, Harouff and Blakeley colluded to have plaintiff moved to a "non-communication" cellblock in RHU, namely C-building's Z wing. C-Z wing contains six cells, and the occupants of these cells are all specifically banned by Ferseli's office from phone and tablet use. Plaintiff had never misused the phone or tablet so his placement on C-Z wing bore not even a pretense of relations to why he was supposedly in RHU. It was undisguised retaliation for his article about his SCDC transfer and treatment and calculated to prevent further communications through which he might publicize and bring further attention to SCDC and his treatment.

70. On June 3, 2025 defendant Earley informed plaintiff that he had been put on C-Z wing and banned from phone and tablet use because of his May 14, 2025 article about SCDC and public complaints made to SCDC headquarters and himself about plaintiff and SCDC conditions.

71. Plaintiff also stopped eating upon his May 20, 2025 RHU confinement for reasons stated above in ¶57.

72. When plaintiff protested that his confinement on C-2 wing was illegal and that he would challenge it, defendant Harouff fabricated a disciplinary report against plaintiff on that same June 3, 2025 day claiming plaintiff had cursed at him, which never happened, and had defendant Blakeley impose a penalty of phone restriction on plaintiff to speciously justify plaintiff's continued denied phone use.

73. Then on June 4, 2025 plaintiff was served with a disciplinary report with Byrd's false claims from May 19, 2025. He was 'heard' on the report on June 10, 2025 before defendant Foster. Plaintiff requested repeatedly that the surveilla camera footage of all activity at and around his GP cell at the time and date she claimed that plaintiff was lewdly exposed to her be presented at the hearing. He explained to defendant Foster that the video would show that Byrd outright fabricated everything she alleged against plaintiff.

74. Defendant Foster refused to look at the footage or have it presented at the hearing. Foster went further to argue in defense of Byrd, demonstrating she was neither impartial nor was she willing to hear any evidence supporting plaintiff's opposition to Byrd's false allegations. Foster made apparent that she was complicit in having plaintiff found guilty of the falsified report, which she did and imposed 45 days of RHU disciplinary time on plaintiff, 60 days phone restriction (the real motive behind the manufactured report and predetermined guilty finding was to stack phone restrictions against plaintiff to keep him from communicating with the outside), 60 days visitation restriction and 60 days canteen restriction.

75. Since being confined in SCDC plaintiff has been compelled under defendant Anderson's policies to hand draft all of his legal filings and all copies of all such filings required for service on opposing counsels and for his own records. Because of this rule and the demand on him to write almost constantly to make necessary filings and copies, plaintiff has developed a large painful knot on the inside of the first digit of his right middle finger where the pen presses when he writes. He can't legibly write in any other fashion.

76. In SCDC under Anderson's rules, an inmate may receive photocopies of handwritten documents only if medical personnel confirm that he has an injury or deformity that makes handwriting copies problematic.

77. On July 2, 2025 plaintiff saw defendant Sanders on sick call concerning his hand injury and need for a medical

pass to accomodate his need for photocopies of handwritten [redacted] legal documents, or some other remedy. Sanders examined his hand and agreed that he needs relief from extensive writing, but said he'd refer the matter to defendant Enloe. Enloe has refused to see plaintiff about his hand injury or to provide him a medical pass to receive copies of his handwritten documents. What plaintiff really needs is relief from all handwriting, even writing original documents which aggrarates and exacarbates the pain and injury to his hand.

78. Plaintiff came to SCDC with two [redacted] painful dental conditions, which he was unable to have addressed via routine dental screening at KCI as a new SCDC intake because defendants Anderson, Davis and others had him transferred to PCI on his second day in SCDC.

79. At PCI plaintiff sought immediate dental treatment, having sent sick call requests to defendant Dr. Baldwin who is PCI's sole dentist and who alone serves the entire PCI [redacted] population of nearly 1000 inmates. She also lacks a full time dental assistant. Defendant Lawson comes to PCI to assist Baldwin once per week which is the only day PCI inmates are able to receive dental care. This situation exists because defendants Anderson, Davis and Earley refuse to provide an adequate dental staff at PCI to meet the inmates' dental needs and they and Baldwin deliberately avoid sending inmates to available outside dental clinics in efforts to save money. Consequently there is an overload of PCI inmates with untreated dental needs, who are put off for months to over a year until their dental conditions deteriorate into emergencies that can only be treated with extractions of teeth. In fact, Baldwin generally refuses and avoids providing PCI inmates any dental care but extractions, even when teeth can be repaired with fillings. Plaintiff is and has been a victim of this deliberate indifference to his own dental needs.

80. Plaintiff's two painful dental conditions consisted of a broken upper left bicuspid and a cavity in a lower left molar.

81. Plaintiff's bicuspid had just broken a couple of months before after which a preexisting filling came out of the tooth. Plaintiff saw a VDOC dentist just before his SCDC transfer, and was scheduled to have the tooth repaired. At that time there was no decay in the tooth. He was also scheduled in

the VDOC to have the molar filled. Plaintiff missed the VDOC dental visit because he was transferred before the appointments.

82. On May 8, 2025 plaintiff sent defendant Baldwin his first of numerous sick call requests complaining of his two painful dental needs. Baldwin responded on May 12, 2025 stating, "You are on the list to check your most painful tooth. The list is long in [RHU]."

83. Although plaintiff sent numerous requests to Baldwin about his painful dental needs, he wasn't seen by her for months, and only because another painful but also potentially fatal dental condition developed, namely an abscess in his upper left incisor.

84. On July 3, 2025 plaintiff informed a PCI nurse, Gonzales, about his abscessed tooth that had just developed. Gonzales had another nurse Alvarez check him. Alvarez put him on antibiotics and referred plaintiff to defendant Baldwin, but warned him, "she may not see you anytime soon. Dental takes forever."

85. Plaintiff was taken to see Baldwin on July 9, 2025 after and because he was able to inform an attorney, Elizabeth Tang, about his condition and she in turn alerted his outside support base and this generated public complaints to SCDC headquarters. Plaintiff was brought from RHU to Baldwin's dental clinic by defendants A. Williams and Hawkins.

86. Upon arrival in the dental clinic plaintiff began discussing his three painful dental issues with defendants Baldwin and Lawson. Baldwin initially refused outright to address or treat anything but his abscessed front tooth, however plaintiff was able to convince Lawson to look at and x-ray his broken bicuspid. Baldwin determined that she was only willing to extract the abscessed incisor and broken bicuspid. She admitted that whereas the broken bicuspid could have been repaired with a filling if treated by her sooner, before it had developed decay, it now had a cavity which was too close to the nerve to drill out and fill. By her own admission, Baldwin explained that plaintiff's bicuspid could not be repaired because of her delay in seeing him, and now had to be extracted. She refused to address the molar.

87. As plaintiff went on discussing his abscessed incisor with Baldwin and Lawson to determine his treatment options and the seriousness of the condition, which both admitted could become fatal at any

moment if the infection from the tooth spread to other body parts, defendants Hawkins and Williams began interrupting them and making comments. "You should go ahead and get it pulled because you can't put a bandaid on a broken bone," the two guards remarked to plaintiff, and went on to recount their own experiences with abscessed teeth. Plaintiff told them he was talking to dental staff and to stay out of his dental conversations, that he was having a discussion to obtain his informed consent to the proposed treatment.

**88.** Hawkins and Williams became angry at [redacted] plaintiff's reply and told him to stop talking and let the dentist hurry and pull his teeth because the[redacted] guards had other things to do. Plaintiff told them again to stay out of his dental issues. In response Williams told the dentist to give them a 'refusal of treatment' form because plaintiff was refusing care. Plaintiff told the dental defendants that he was not refusing care but was seeking full disclosure of his conditions and treatment options for purposes of informed consent, since having his teeth pulled was a choice that would have permanent effects on him. At that point Williams and Hawkins signed a fabricated refusal of treatment for plaintiff's abscessed tooth in his name, when plaintiff never refused.

**89.** Defendants Hawkins' and Williams' actions angered plaintiff and provoked a heated argument between them which raised plaintiff's blood pressure to the point that he could not receive any dental treatment that day.

**90.** Plaintiff complained about Hawkins' and Williams' actions to a PCI Associate Warden, but was not seen by Baldwin again until July 16, 2025, after he was released back to GP. On that day his broken bicuspid was extracted, but Baldwin would not address his concerns about his painful molar, and would not extract his abscessed incisor based upon the falsified refusal of treatment form signed by Hawkins and Williams on July 9, 2025. Plaintiff was, as a result, forced to apply to outside private dentists at his own expense for a root canal. The outside treatment process can take months to arrange and receive SCDC approval, [redacted] months which plaintiff may not have due to the unpredictable danger of the infection in his abscessed tooth spreading.

**91.** Plaintiff was able again to communicate the denied and delayed care concerning his abscess and decaying molar to the outside via the attorney Ms. Tang, which prompted

public protests and complaints to SCDC. In turn, on July 30, 2025 plaintiff was brought to defendant Baldwin's office where he was scolded by her for the outside protests and complaints. Plaintiff had by then begun the process of seeking outside dental care at his own expense, and Lawson only took pictures and x-rays of his abscessed tooth which she said could be shared with the outside dentist. Plaintiff still has not been cleared for the outside dental treatment, he still has the abscess and still can't get it treated by Baldwin based upon the false statement that he refused care on July 9, 2025.

92. SCDC could easily send him for outside dental care, even for a root canal which would save his tooth and cost SCDC nothing because as an ICC inmate, all of plaintiff's medical and dental expenses are paid by VDOC or insurance available through VDOC like Medicaid.

93. Plaintiff was returned to RHU on July 18, 2025 by defendant Earley, and has had no access to antibiotics or pain medications since then.

94. After scolding plaintiff on July 30, 2025, defendant Baldwin then refused his requests for antibiotics and pain medications to help contain his infected tooth and pain until he could see an outside dentist. Baldwin admitted his need of both medications, but told him she would not order them because plaintiff had made complaints to outside people who in turn made complaints against her for denying him dental care or outside referral. Baldwin has therefore left plaintiff to suffer in pain from the abscess and continues to refuse him care for his molar, and left him in danger of an uncontrolled spread of infection from the abscess which she knows and admitted could happen at any time and could kill him. Baldwin's treatment of him is now malicious.

95. On July 30, 2025 plaintiff asked Baldwin why she persisted in refusing to look at and fill his molar, which has caused him extreme pain for months. She responded because her list to do fillings is extremely long.

96. In the face of the denied dental care by Baldwin, Lawson, Hawkins and Williams, plaintiff was forced on repeated occasions to try and treat and relieve the suffering from the abscess himself. At points he has developed severe swelling of his face, lips and gums and large pockets of infected fluid and blood beneath his gums. To relieve the swelling, infection and fluid buildups, he has used a sharpened staple, soap and hot water from

the tap, to [redacted] puncture and lance, drain and try to flush out the pockets, which was extremely painful, especially where several times he had to push the staple down to the root and nerve of the abscess beneath the gum. This has been the only way he has been able to relieve the swelling and pressure in his mouth and face from the inflamed abscess.

97. The only outside person plaintiff has been able to directly correspond and communicate with since Fergeli and the other defendants cut all of his lines of communication beginning on May 22, 2025 and moved him into C-2 wing, is an attorney based in Washington, DC, Elizabeth Tang, who works with the National Women's Law Center lawfirm. Plaintiff has had to rely exclusively on Ms. Tang since then to get word to the outside about his treatment and conditions in SCDC. Initially SCDC officials and defendants tried to block and frustrate his ability to communicate with Ms. Tang, but her complaints to SCDC's General Counsel enabled her to speak by phone or Zoom calls with plaintiff each week. Defendants have continued to interfere with his communications with Ms. Tang and her legal assistance efforts for him.

98. Plaintiff's calls with Ms. Tang are acknowledged by SCDC officials and its General Counsel to be privileged and confidential legal calls, which neither plaintiff nor Ms. Tang consent to being monitored or recorded and for which no warrants have been obtained to monitor or record. Yet, defendant Blakeley has admitted to plaintiff that he and other SCDC officials, including defendant Harouff, have listened in on and viewed and even recorded plaintiff's calls with Ms. Tang, without a warrant or their consent.

99. Defendant Conwell has also been complicit with these defendants in frustrating and blocking plaintiff's ability to communicate with outside people and Ms. Tang.

100. Since May 22, 2025 Conwell has blocked almost every piece of incoming personal correspondence received for plaintiff at PCI, especially while he's been confined in RHU. For example, some 25 letters sent from one correspondent alone, Mr. Kevin Jeanes who is a highly active and vocal prisoner advocate, has been intercepted and refused delivery to plaintiff by Conwell, for reasons not permitted by SCDC policy. In each case of his rejected mail, Conwell falsely claimed his letters were

information printed from the internet, when they were not. Many of Mr. Jeanes' letters were written updates from him to plaintiff about information conveyed by Ms. Tang about his treatment and conditions and public responses. Mr. Jeanes' letters were targeted especially because of their content being about plaintiff's mistreatment and public advocacy on his behalf.

101. Defendant Conwell has also targeted and intercepted and read mail identified on the face of the mailing envelopes to and from Ms. Tang and her law firm as "Legal Mail." Ms. Tang has sent plaintiff printed documents off the federal court's Pacer system from plaintiff's own federal cases needed to make filings under deadline, evidentiary documents, correspondence, and documents to be filed in plaintiff's cases. Conwell has opened, read and taken such mailings on no less than 4 occasions. Conwell even intercepted and returned mail plaintiff sent to Ms. Tang containing pleadings to be filed under deadlines, telling plaintiff he could not send mail to Ms. Tang at her mailing address. Ms. Tang had to complain to SCDC General Counsel to have Conwell's actions overruled and to allow plaintiff to send her mail.

102. Numerous items of identified legal mail sent to the courts and Virginia's Attorney General's office who is defending several of plaintiff's pending state court cases, have not been sent out by Conwell.

103. Because of Conwell's actions in complicity with the other defendants' actions herein related to obstructing and frustrating his communications by mail, phone and otherwise, plaintiff has been unable to directly communicate or correspond with anyone in society, including loved ones, friends, the media, his publishers, etc., all as part of a joint effort by defendants Anderson, Davis, Eorley, Fergeli, Dotson, Robinson, Harouff, Conwell and others to hold plaintiff incommunicado and prevent him from exposing and publicizing through his writings and audio recordings conditions within the SCDC and VDOC.

104. As a result of these constraints on plaintiff's communications he has been unable to pursue outstanding publishing projects that he was collaborating with various publishers on until his SCDC transfer including a 3-volume autobiography, a 2-volume anthology of his political writings, a collection of his articles on prison conditions in various states, an art and poetry book, and numerous other publishing projects. Plaintiff's writings on prison conditions has been brought

to a near stop and stand-still, whereas before his May 1, 2025 SCDC transfer he was working on multiple books and producing 4-6 articles per week, since being in SCDC he has produced no more than 4 articles (in 3 months) and has not been able to work on and complete his books at all.

105. On May 23, 2025 plaintiff spoke with defendant Rucker explaining in detail his preexisting conditions of PTSD, chronic depression, insomnia etc and the sources of these conditions having been nearly 2 decades in VDOC solitary confinement and experiencing extensive abuses by custodial officials, that being in RHU exacerbated these conditions and how these conditions rendered him unsuitable to live with another person in GP. Rucker blew plaintiff off, telling him he needed to just "learn to cope." Plaintiff has since been denied any mental health care or consideration, especially with respect to RHU confinement and single cell GP housing, at PCI and within SCDC.

106. As an SCDC Grievance coordinator, defendant McKnight had the power to investigate, correct and remedy the various wrongs done to plaintiff as described throughout this Complaint. Plaintiff directed repeated complaints to McKnight seeking her investigation and correction of these wrongs, and in almost every instance McKnight made a studied effort to avoid and refuse to accept and address plaintiff's complaints for the purpose of allowing the abuses to happen and the ~~other~~ responsible defendants to avoid correction.

107. Plaintiff swears to the truth of all the facts stated in paragraphs 1 through 106 under penalty of perjury and bases those statements on personal knowledge.

## CLAIMS FOR RELIEF

## COUNT I

42 U.S.C. § 1983 - First Amendment - Retaliation - Conspiracy Against Defendants Anderson, Dotson, Robinson, Davis, Fergeli, Hollis, Greggs, Ocean, John Does #s 1 through 3, Earley, Harouff, Byrd, Foster and McKnight

108. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

109. Defendants Dotson, Robinson, Anderson, Davis, Fergeli,

Hollis, Greggs, Ocean, John Does #s 1 through 3, Earley, Harouff, Byrd, Foster and McKnight retaliated against plaintiff 1) when they transferred him to SCDC; 2) when they transported him upon his arrival in SC on May 1, 2025 in an unpadded steel-lined transport van with the factory-installed seatbelts removed and drove recklessly from the airport to KCI while having him restrained in a cramped and defenseless manner in metal restraints; 3) when they threw him into extreme and abusive solitary confinement denying him basic necessities and humane treatment; 4) when they stripped him of the ability to communicate with the outside and to publish his writings and articles; 5) when they fabricated degrading, false and slanderous disciplinary infractions against him; and 6) when they subjected him to the series of unlawful and abusive treatments set out throughout this Complaint. These defendants undertook these actions in retaliation for plaintiff's past protected conduct of publishing articles highlighting VDOC's and SCDC's poor conduct and treatment of himself and prisoners in their systems and filing lawsuits to vindicate his rights.

110. Plaintiff has a First Amendment right to speak out about the unconstitutional conditions and conduct of officials and guards in the VDOC and SCDC.

111. These defendants knew about plaintiffs' articles because they were repeatedly confronted by public complaints and protests, they responded to his articles in the media themselves and they directly confronted and threatened plaintiff and admitted to him that their reprisals and actions against him were in response to his articles and public responses, and that these responses were calculated to prevent him from publishing further articles and to deter such efforts on his part in the future.

112. Plaintiff is well-known by VDOC and SCDC officials and these defendants for his lawsuits and history of speaking out in writing. In 2009, VDOC deemed him a "domestic terrorist" for this work and, at least as early as that date, began interfering with his ability to communicate outside the prison system and to speak out about VDOC's behavior.

113. Defendants' efforts to hold plaintiff incommunicado and throwing him into solitary confinement, and their other reprisals were all actions that would be capable of deterring a person of ordinary firmness from further exercising their First Amendment rights.

114. Defendants Dotson, Robinson, Anderson, Davis, Fergeli, Hollis, Greggs, Ocean, Earley, Harouff, Byrd, John Does #s 1 through 3, Foster and McKnight's actions were the direct and proximate cause of the violations of plaintiff's constitutional rights and the damages he suffered, including pain, suffering, negative health effects, emotional distress, and other economic and non-economic losses, in an amount to be proven at trial.

## COUNT II

42 U.S.C. § 1983 - Eighth Amendment / Fourteenth Amendment (Cruel and Unusual Punishment / Due Process) - Failure to Protect Against Defendants Anderson and John Does 1 through 3

115. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

116. On May 1, 2025 defendants John Does #s 1 through 3 under defendant Anderson's directions had plaintiff transported from a Columbia, SC airport to KCI inside an unpadded steel-lined van that had the factory-installed seatbelts removed where he was manacally restrained in a cramped and unprotected manner, while they deliberately drove said vehicle recklessly at high speeds, posing a substantial risk of serious harm to plaintiff, disregarding an excessive and obvious risk to his health and safety, and deliberately failing to protect him from such harm.

117. By having plaintiff transported in this manner and failing to protect him, defendants Anderson and John Does #s 1 through 3 were deliberately indifferent to his health and safety in violation of the Eighth and/or Fourteenth Amendments to the U.S. Constitution.

118. As a result of these defendants' failure to protect him, plaintiff experienced serious emotional distress and pain, humiliation, continued extreme pain and battery, fear for his life, and severe physical injury.

## COUNT III

42 U.S.C. § 2000cc-1 - Religious Land Use And Institutionalized Persons Act - 42 U.S.C. § 1983 - Fourteenth Amendment Equal Protection Against Defendants Anderson, Davis, Hollis, Greggs, Ocean Earley and McKnight

119. plaintiff incorporates each paragraph of this complaint as if fully restated here.

120. Defendants Anderson, Davis, Hollis, Greggs, Ocean, Earley and McKnight imposed a substantial burden on the religious exercise of plaintiff, a person confined within a prison, when they 1) forcibly cut his facial hair bald on May 1, 2025; 2) denied him the entitlement while in SCDC custody to grow his ~~facial~~ hair out lest he be subject to disciplinary action and forced haircuts; 3) deny him an Ital Rastafarian diet; 4) deny him the entitlement to possess and smoke tobacco in his Rastafarian worship practices; and 5) deny his possession and use of his Rastafarian Bible and prayerbooks since and as a result of his confinement in SCDC.

121. The burdens imposed on plaintiff's religious practice as stated above was and is not in furtherance of any compelling government interest. It was and is not the least restrictive means of furthering the government's interests in this context.

122. The denial by these defendants of plaintiff's ability in the SCDC to possess and smoke tobacco in his Rastafarian religious practice while allowing Native Americans inmates in the SCDC to smoke tobacco in their religious practices constitutes discrimination on basis of religion against the Equal Protection clause of the U.S. Constitution.

123. Defendants Anderson, Davis, Hollis, Gregs, Ocean, Earley and McKnight's actions are the direct and proximate cause of the violation of plaintiff's rights under the U.S. Constitution and RLUIPA and the damages he suffered including pain, suffering, emotional distress, and other economic and non-economic losses, in an amount to be proven at trial.

## COUNT IV

**42 U.S.C. § 12102 - Reasonable Accomodations, Americans with Disabilities Act (ADA) Against Defendant SCDC**

124. plaintiff incorporates each paragraph of this complaint as if fully restated here.

125. SCDC (by and through the individual defendants acting in their official capacities) is a public entity as defined in 42 U.S.C. § 12131(1)(A).

126. Plaintiff suffers a large swollen area to the inside of the first digit of his right middle finger resulting from and causing severe pain from being compelled under SCDC policy to hand draft all hand-written legal documents and all required copies. This injury constitutes a physical disability and causes him pain, suffering and inability to write and thereby communicate as needed to pursue pending and anticipated litigations in his forced efforts to write and produce required copies of legal documents. Plaintiff submits that it took him over two months to hand-draft only the original copy of this Complaint, which caused him severe pain throughout the entire time. He is for this reason impaired from drafting and filing a motion and brief for interlocutory injunctive relief herewith, which he desires to submit and is entitled to.

127. Defendants Sanders and Enloe and McKnight refuse to accomodate plaintiff's need for writing aids and photocopies of required duplicates of his legal filings, which accomodations are available and permitted under SCDC policies.

128. The SCDC violated the ADA by failing to make "reasonable modifications to policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

129. Defendants' actions were in violation of SCDC policy and so constituted an unlawful and discriminatory practice.

130. Defendants further knew of plaintiff's disability because his condition was brought to their attention during medical visits, sick call assessments and examinations, and referrals by medical staff with recommendations to provide him writing and copying accomodations, including through the issuance to him of a pass to be provided the accomodations plaintiff requested.

131. Plaintiff also suffers mental health disabilities - PTSD, depression, etc. - which qualify as disabilities under ADA. These impairments substantially limit one or more major life activities.

132. SCDC has (by and through the individual defendants operating in their official capacities), violated the ADA by failing to ensure people with mental health disabilities have access to, are permitted to participate in, and reap the benefits of programs, services and activities. 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1). In particular, SCDC holds inmates in solitary confinement causing,

them to suffer consequent mental disabilities and/or because of and despite mental impairments, and fail to account for inmates' mental illness in periodic reviews of their solitary confinement.

## COUNT V

42 U.S.C. § 1983 - Eighth / Fourteenth Amendment (Deliberate Indifference to Serious Medical, Dental and Mental Health Needs) - Retaliation - First Amendment Free Speech Violations Against Defendants Anderson, Davis, Earley, Enloe, Sanders, Rodrigvez, Baldwin, Lawson, Williams, Hawkins and McKnight

133. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

134. Defendants Enloe, Rodrigvez and McKnight were deliberately indifferent to plaintiff's leg injury which he suffered on May 1, 2025 as a result of the reckless driving and transport of plaintiff in the steel-lined and unpadded transport vehicle on that date.

135. Defendants Anderson, Davis, Earley, Blakeley and Perks were and are deliberately indifferent to the serious mental health effects and injuries to plaintiff resulting from his solitary confinement in their inhumane RHU. As was defendant Rucker and McKnight.

136. Defendants Baldwin, Lawson, Hawkins, Williams and McKnight were deliberately indifferent to plaintiff's painful and as yet untreated cavity in his lower left molar, delayed treatment of his broken upper left bicuspid resulting in its developing decay and deteriorating beyond repair, and denied treatment of his abscessed upper left incisor and denied antibiotics and pain medications for these painful and life threatening conditions, and in retribution for plaintiff's publicizing his denied dental care and consequent public complaints to SCDC officials.

137. Defendants Anderson, Davis, Earley and McKnight are deliberately indifferent to plaintiff's serious dental needs by their failing to provide a dental department at PCI that is adequately staffed to provide for the dental needs of PCI's nearly 1,000 inmate population.

138. Defendant Baldwin, Lawson and McKnight are

deliberately indifferent to plaintiff's serious dental needs by their refusing as a matter of convenience and a cost-saving scheme to provide restorative dental care to PCI inmates as a routine practice and electing instead to only pull their teeth, and leaving PCI inmates like plaintiff to suffer without treatment dental conditions which can be treated by fillings until their conditions deteriorate to the point of becoming infections, emergency situations or untreatable except by extracting one or more teeth.

139. Defendants Williams and Hawkins as non-medical prison guards were deliberately indifferent to plaintiff's life-threatening abscessed tooth when they interfered with his access to emergency dental care by interrupting his attempts to communicate with defendants Baldwin and Lawson about his dental conditions, and then Williams' and Hawkins' falsifying a statement that plaintiff refused treatment for his abscessed truth when and because plaintiff rebuffed their interferences in his attempts to communicate with dental staff and obtain sufficient information from such dental staff to give informed consent to their proposed treatment for his abscessed tooth.

140. Each of these instances of defendants actions constituted discrete incidents of unconstitutional deliberate indifference to plaintiff's basic human needs, viz medical, dental and mental health needs, denied him the minimum civilized measures of life's necessities, posed an unreasonable risk to his health and safety, and were well below contemporary standards of decency and basic humane treatment, all in violation of the Eighth and/or Fourteenth Amendments.

141. The above-named defendants' actions are the direct and proximate cause of the violations of plaintiff's constitutional rights and the damages he has suffered and will continue to suffer, including pain, suffering, emotional distress, humiliation, fear of death, and other economic and non-economic losses, in an amount to be proven at trial.

## COUNT VI

42 U.S.C. § 1983 - Fourteenth Amendment - Due Process Violations Against Defendants Fergeli, Byrd, Foster and Earley

142. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

143. SCDC's inmate disciplinary policy sets out in mandatory language that inmates may not be confined in punitive RHU without basic procedural due process protections and guilty findings for disciplinary infractions.

144. Defendants Fergeli, Foster, Byrd, Earley and McKnight denied plaintiff basic due process in having him convicted of a false and fabricated slanderous disciplinary report for which he was punished by placement in long-term solitary confinement, the conditions of which constitute known torture and are inhumane and unconstitutional per se, and thus impose a significant and atypical hardship in relation to the ordinary incidents of prison life. Plaintiff's due process rights were violated where Foster was not an impartial trier of fact but was both biased, complicit in plaintiff's receiving the fabricated report so to speciously justify banning his phone use and having him thrown in solitary in retaliation for his First Amendment activities as set out in Count I above. Foster further refused to review or allow plaintiff to present at his disciplinary hearing as evidence, surveillance camera footage which he explained to Foster and repeatedly would show that Byrd's report was completely fabricated. Defendant Earley upheld Foster's conviction and punishment of plaintiff and, along with Fergeli, was party to having Byrd fabricate the report against plaintiff as retaliation and a specious pretext for putting him in solitary, cutting off his lines of communication to the outside, and obstructing his publishing.

145 As a result, the named defendants were the direct and proximate cause of the violations of plaintiff's constitutional rights and the damages he suffered, including pain, suffering, emotional distress, and other economic and non-economic losses, in an amount to be proven at trial.

## COUNT VII

### 42 U.S.C. § 1983 - Eighth Amendment / Fourteenth Amendment Violations Against Defendants Anderson, Davis, Fergeli, Earley, Blakeley, Perks, Rucker, and McKnight

146 Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147. SCDC and each defendant Anderson, Davis, Fergoli, Earley, Blakeley, Perks, Rucker and McKnight have violated plaintiff's Eighth and/or Fourteenth Amendment rights by subjecting him to repeated and long-term solitary confinement that serves no legitimate penological purpose, is inhumane and torturous and barbaric and results in serious deprivations of basic human needs, significant mental and physical harms, and substantial risk of such harms. SCDC and each of the individual named defendants have been deliberately indifferent to such harms and risk of harms.

148. Defendants know and have known of the harms and deprivations within and caused by their RHUs as set forth herein, and have designed, condoned, enforced, or have been deliberately indifferent to the conditions that cause them.

## COUNT VIII

**42 U.S.C. § 1983 - First Amendment - Denial of Free Speech / Press - Violation of Attorney / Client Privilege - Denial of Legal Confidentiality / Access to the Courts - Wiretap Violations 18 U.S.C. §§ 2510 et. seq. Against Conwell, Harouff, Blakeley and McKnight**

150. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

151. The First Amendment to the U.S. Constitution guarantees inmates the right to freely and privately communicate with attorneys and not be censored because of the content of their speech and expressed ideas, to private correspondences with the courts, and to petition the courts for redress and as a means of protecting constitutional and stat[u]tory rights. Defendants Conwell and McKnight have repeatedly violated these rights as have Blakeley and Harouff in obstructing, censoring and monitoring his communications with attorney Elizabeth Tang and the courts. Conwell has also violated his First Amendment right to communicate with those on the outside.

152. Also, by intercepting, monitoring and listening in on his phone and video calls with said attorney without their consent or court order, defendants SCDC, Blakeley and Harouff have violated the federal Wiretap Act (Title III)

18 U.S.C. § 2510 *et seq.*

153. These deprivations are not rationally connected to any legitimate government interest, denies plaintiffs' sole avenue of accessing the courts particularly in pro se cases and in communicating with the outside and attorneys; whereas allowing these avenues of communication would not otherwise impact the VPOC's nor SCDC's legitimate functioning or have negative ripple effects. In fact it undermines his safety by preventing him from petitioning for the protection of his rights or sharing his dangerous and detrimental conditions with outside people, the public, and expressing his views in the media and completing publishing projects.

154. The above-named defendants' actions are excessive in relation to any such legitimate purpose, were and are entirely punitive in nature, or were malicious, or made with reckless disregard of plaintiffs constitutional and statutory rights.

Plaintiff swears to the truth of the facts set out in paragraphs 1 through 106 above under penalty of perjury and bases his statement of those facts on personal knowledge.

Plaintiff demands trial by jury on all issues so triable in this case.[3]

THEREFORE, plaintiff seeks the following relief in judgment against defendants:

A. Declaring that defendants have violated plaintiffs' rights as set out in Counts I through VIII (¶¶ 108 through 154) above;

B. Temporary Restraining order, Preliminary Injunction and permanent Injunction enjoining defendants, and their successors, agents, and assigns from further violation of the constitutional rights of plaintiff and the ADA, RLUIPA and Title III wiretap Act;

---

3. Plaintiff also brings claims under 28 U.S.C. § 1367 (pendent jurisdiction) for state law claims against defendants for, inter alia, per se slander and defamation for defendant Byrd's falsely imputing acts of a criminal and unchaste character to plaintiff, etc.

C. Awarding plaintiff compensatory, punitive, presumed, special and nominal damages against defendants jointly and severally in such sum in excess of $30 as a jury finds fair and just;

D. Awarding plaintiff costs and fees and interest;

E. Granting such other equitable relief as the court deems just and fair.

Respectfully submitted,

____________________
Plaintiff pro se

Reply to: Kevin Johnson, No. 397279
Perry Correctional Institution
430 Oaklawn Road
Pelzer, SC 29669